UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CAROLYN S. MORRISON,              )
                                 )
                Plaintiff,       )
                                 )
       v.                        )    No.  4:07CV1191 DJS
                                 )                    (FRB)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
                Defendant.       )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

On July 1, 2004, plaintiff Carolyn S. Morrison filed an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.; and an application for Disability Insurance Benefits (DIB) pursuant to Title II, 42 U.S.C. §§ 401, et seq., in which she claimed that she became disabled and unable to work on September 1, 2003. (Tr. 51-53, 121-23.) On initial consideration, the Social Security Administration denied plaintiff's applications for benefits. (Tr. 40-43, 58, 91-96.) On July 13, 2006, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 328-48.) Plaintiff testified and was represented by counsel. On October 24, 2006, the ALJ

issued a decision denying plaintiff's claims for benefits. (Tr. 10-19.) On June 8, 2007, after review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 4-8.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the hearing on July 13, 2006, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff testified that she lives in a house with her eleven-year-old daughter and eight-year-old son. (Tr. 332.) Plaintiff testified that she has an eighth grade education and obtained vocational training as an over-the-road truck driver. (Tr. 332-33.)

Plaintiff previously worked as a self-employed cleaning person and stopped working in 2003. (Tr. 178, 333-34.) Plaintiff testified that she continued to receive income from this business through April 2004 inasmuch as her friend and business partner continued to pay plaintiff during that time. Plaintiff testified that with such arrangement, her friend essentially bought the business from her. (Tr. 333-34.) From 2000 to 2001, plaintiff worked at Hardee's, Jack-in-the-Box and McDonald's. In 1997, plaintiff worked at Wiseman's boxing up sewing material. From 1990 through 1997, plaintiff worked as an over-the-road truck driver and at mailing facilities sorting envelopes. (Tr. 178, 334-35.)

Plaintiff testified that she lived in her children's grandmother's home from February 2002 through April 2005, and cared

for the grandmother at that home during the last eight months of that period, which included feeding the grandmother and emptying her bedside commode.  Plaintiff testified that she also cleaned the house while she lived there.  (Tr. 335-38.)

Plaintiff testified that she had applied for and received unemployment benefits approximately six years prior, and received worker's compensation for an injury sustained while working at Hardee's.  (Tr. 338.)  Plaintiff testified that two years prior, she had been in jail for parking tickets.  (Tr. 339.)

Plaintiff testified that she used drugs and alcohol in the past but had never been to a rehabilitation center on account of such use.  (Tr. 339.)  Plaintiff testified that she last smoked marijuana when she was eighteen years of age and last used cocaine when she was twenty-one or twenty-two years of age.  Plaintiff testified that she has not had a drink since her father passed away five years prior because her father's death was attributed to his alcoholism.  (Tr. 340.)

Plaintiff testified that she sustained a burn injury in August 2003 and that she physically recovered from that injury within twelve months.  (Tr. 340.)  Plaintiff testified that she underwent knee surgery in September 2004 and physically recovered from that surgery within one year.  Plaintiff testified, however, that she suffers mentally and has panic attacks when she is around a lot of people or smells.  (Tr. 341.)  Plaintiff testified that she has been diagnosed with post-traumatic stress disorder, but that her caseworker thinks she may have bipolar disorder as well.

(Tr. 341-42.)  Plaintiff testified that she visited her family doctor who then referred her to the Community Counseling Center, where she was a client between 2003 and early 2005.  (Tr. 342-43.)[1] Plaintiff testified that she no longer was a client at the Center because she moved from the area.  (Tr. 342.)

As to her daily activities, plaintiff testified that she drives to the grocery store and drives her children to and from school.  Plaintiff testified that the drive is eight-miles round trip, and that she makes the trip twice a day.  (Tr. 344.) Plaintiff testified that she will not drive if she has taken her medication because she does not want to endanger anyone.  Plaintiff testified that she takes her medication when she comes home and will not take her medication if she knows she has to drive.  (Tr. 347-48.)  Plaintiff testified that she may pick up a few things from the grocery store every other day, such as bread and milk, but that she mainly does her grocery shopping once a month when she receives her food stamps.  (Tr. 346.)  Plaintiff testified that she visits with her mother once every other week when her mother comes to visit her at her home.  (Tr. 344-45.)  Plaintiff testified that she walked to church services every Sunday when she lived in Perryville, and that the church was located three houses from her home.  Plaintiff testified that the services lasted one and one-half hours.  Plaintiff testified that she has not attended church since moving from Perryville.  Plaintiff testified that she did not

---

[1]Plaintiff was unsure of the exact dates of treatment.  (Tr. 342-43.)

- 4 -

engage in any other church activity while living in Perryville nor since that time. (Tr. 345.) Plaintiff testified that she engages in no outdoor activity. (Tr. 345-46.) Plaintiff testified that she has no difficulty with personal care. (Tr. 345.) Plaintiff testified that she watches television and sometimes reads. (Tr. 346.) Plaintiff testified that she washes dishes at home and does the laundry. Plaintiff testified that her daughter helps her carry the laundry basket down the stairs. Plaintiff testified that she tries to help her children with some of their homework but that she cannot comprehend her daughter's homework. (Tr. 346-47.) Plaintiff testified that she does not attend her children's school functions because of the crowds. (Tr. 347.) Plaintiff testified that she has difficulty with sleep in that she sleeps only three and one-half to four hours a night. Plaintiff testified that she has been in this sleep pattern for approximately one and one-half years. (Tr. 346.)

### III. Medical Records[2]

Plaintiff was admitted to the emergency room at Perry County Memorial Hospital on August 22, 2003, complaining of toothache and lower jaw pain. Plaintiff was thirty-three years of

---

[2]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes and reports from Dr. Syed Shahid Mumtaz dated June 16 to September 16, 2006. (Tr. 324-27.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

age.  It was noted that plaintiff recently sustained a broken tooth, but that the condition had not bothered her until presently. Physical examination showed widespread dental decay.  Plaintiff was given Keflex, an antibiotic, and was instructed to visit a dentist within three days.  Plaintiff was also given Lorcet[3] for pain. (Tr. 255-60.)

Plaintiff was admitted to the emergency room at Perry County Memorial Hospital on August 24, 2003, after having sustained burn injuries to her face, shoulders, arms, thighs, and legs. Silvadene cream was applied and plaintiff was given Demerol[4] and Toradol.[5]  Plaintiff was discharged that same date in improved condition and was given Percocet[6] upon discharge.  Plaintiff was instructed to follow up with her personal physician within one day. (Tr. 261-68.)

Plaintiff visited Dr. Laurie A. Womack on August 25, 2003, with respect to her burn injuries sustained the previous night.  Plaintiff reported to Dr. Womack that she was using gasoline to burn brush along a fence line when the flame flared up

_____

[3]Lorcet contains hydrocodone and acetaminophen and is used to relieve moderate to moderately severe pain.  Medline Plus (last revised Mar. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a601006.html>.

[4]Demerol is indicated for the relief of moderate to severe pain.  Physicians' Desk Reference 2851 (55th ed. 2001).

[5]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level.  Physicians' Desk Reference 2789-91 (55th ed. 2001).

[6]Percocet is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1211 (55th ed. 2001).

and burned her. It was noted that plaintiff went to the emergency room and was told to use Silvadene cream for her burn injuries. Plaintiff reported to Dr. Womack that she had good control of her pain but she believed that she lost her Percocet prescription. Dr. Womack reviewed plaintiff's medical history and noted plaintiff to have problems with depression for which she was taking Lexapro,[7] but that she recently ran out of this medication. It was also noted that plaintiff had some arthritis-type pains in multiple joints for which she was prescribed Bextra.[8] Plaintiff reported this medication to work very well. Physical examination showed first and second degree burns about the face, shoulders and legs due to flash fire. Plaintiff was diagnosed with first and second degree burns, and was instructed to attend whirlpool therapy and to apply sterile dressings with Silvadene. Plaintiff was also diagnosed with depression, for which plaintiff's Lexapro was refilled; and arthritis, for which plaintiff's Bextra was refilled. (Tr. 306.)

It was noted that plaintiff did not appear for whirlpool therapy immediately after her initial appointment with Dr. Womack

---

[7]Lexapro is used to treat depression and generalized anxiety disorder. Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603005.html>.

[8]Bextra is a non-steroidal anti-inflammatory drug (NSAID) used to relieve some symptoms caused by arthritis, such as inflammation, swelling, stiffness, and joint pain. Medline Plus (revised Apr. 8, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6020 11.html>. Bextra has since been removed from the market due to potential cardiovascular side effects. ACPA Medications & Chronic Pain (Suppl. 2007), *American Chronic Pain Ass'n, available at* <http://www.theacpa.org/documents/ACPA%20Meds%202007%20Final.pdf>.

because she had learned that her house was on fire. (Tr. 305, 306.) Nor did plaintiff appear for appointments scheduled the following day with Dr. Womack as well as with Dr. David Deisher, a burn specialist. (Tr. 306.) Plaintiff was seen that day, however, by Dr. Womack's nurse who arranged with Dr. Womack's partner for plaintiff to obtain another prescription for Percocet. (Tr. 305.)

Plaintiff returned to the emergency room at Perry County Memorial Hospital on August 27, 2003, complaining of increased pain relating to her burn injuries. Plaintiff was discharged without additional medication. Transportation was arranged to take plaintiff to see Dr. Deisher as scheduled. (Tr. 249-54.)

On August 29, 2003, plaintiff appeared at Southeast Missouri Hospital to see Dr. Deisher with respect to the burns on her face, anterior trunk and legs. Dr. Deisher noted that plaintiff failed to keep various scheduled appointments with him earlier in the week and that plaintiff reported that transportation problems kept her from these appointments. Plaintiff's appearance on August 29 was unscheduled. Dr. Deisher noted plaintiff to have sustained the burns while burning material on her property in Perryville and that she went to the emergency room in Perryville at that time. Plaintiff reported to Dr. Deisher that she had run out of pain medication but that the doctors in Perryville would not give her any more. (Tr. 312, 317.) It was apparent to Dr. Deisher that plaintiff had had difficulty maintaining the wounds, which appeared to be infected. Plaintiff's legs were noted to be swollen. Physical examination showed flash burns about plaintiff's

face, chest, upper abdomen, and legs.  Dr. Deisher diagnosed plaintiff with first and second degree burns with signs of infection.  Plaintiff was admitted to the hospital at that time for administration of antibiotics and appropriate burn care.  (Tr. 317.)  On September 1, 2003, plaintiff was discharged from the hospital in stable condition.  Plaintiff was given oral antibiotics and pain medication and was prescribed outpatient physical therapy and burn care.  (Tr. 319-20.)

Plaintiff followed up with Dr. Womack on September 4, 2003, who noted plaintiff to have been very non-compliant the previous week with her care.  Dr. Womack noted plaintiff to now be on Levaquin (an antibiotic) and to have taken Ativan[9] due to increased anxiety.  Plaintiff gave conflicting reports to Dr. Womack regarding her prescription and dosage requirements for Percocet.  Upon confirmation with the pharmacy, Dr. Womack determined that plaintiff should not be out of her prescription medication.  Plaintiff appeared irate when her medications were discussed.  It was noted that plaintiff was participating in whirlpool therapy from which she was obtaining benefit.  Physical examination showed plaintiff's burn condition to be improving with new skin growth noted.  Dr. Womack instructed plaintiff to continue with Levaquin and to follow up with Dr. Deisher, including with respect to Percocet refills.  Dr. Womack expressed concern

---

[9]Ativan is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety or anxiety associated with depressive symptoms.  Physicians' Desk Reference 3348 (55th ed. 2001).

regarding plaintiff's reaction and "not being up-front" regarding her pain medication, including plaintiff's reports of lost prescriptions. Dr. Womack also diagnosed plaintiff with depression with anxiety, moderate and recurrent. Plaintiff reported that she could no longer take Lexapro inasmuch as it was not covered by Medicaid. Dr. Womack determined to prescribe Zoloft[10] for plaintiff and Ativan was given for episodes of severe anxiety. Plaintiff was instructed to follow up in three to four weeks regarding the psychotropic medication. (Tr. 304.)

Plaintiff returned to Dr. Deisher for follow up on September 5, 2003. Dr. Deisher noted significant improvement and that the burns on plaintiff's face were essentially healed. Plaintiff was instructed to continue with daily whirlpool therapy and Silvadene dressings. Plaintiff requested a prescription for more Percocet, reporting that her children flushed her pain medication down the toilet. Dr. Deisher prescribed a few more Percocet but informed plaintiff that he would not prescribe any more. Plaintiff also reported that the pharmacy would not give her any gauze and that she could not afford to purchase any. Dr. Deisher's office supplied plaintiff with gauze and an Ace wrap. Plaintiff was instructed to return in ten days for a recheck. (Tr. 311.)

On September 10, 2003, plaintiff called Dr. Deisher requesting an additional prescription for Percocet. Dr. Deisher

---

[10]Zoloft is indicated for the treatment of depression. Physicians' Desk Reference 2553-54 (55th ed. 2001).

determined to switch plaintiff from Percocet to Vicodin[11] and to start to taper plaintiff off of the medication. (Tr. 310.)

On September 15, 2003, the Fitness and Rehab Center reported to Dr. Deisher that plaintiff had appeared for seven therapy/whirlpool sessions. It was noted that plaintiff failed to appear for three scheduled sessions. Physical therapist Ryan Buchheit reported that plaintiff's main impairment continued to be small ulcerated areas on her left and right shins. It was noted that plaintiff's pain level was fluctuating and tolerable. It was also noted that plaintiff's wounds were closing well and that plaintiff may be eligible for discharge either immediately or after one or two more sessions. (Tr. 289.)

Plaintiff was discharged from whirlpool therapy on September 23, 2003, with reports that she was getting along fairly well. (Tr. 282.)

Plaintiff returned to Dr. Womack on May 13, 2004, for a refill of her medication. Plaintiff reported that she ran out of Zoloft and then took samples of Lexapro until she exhausted her supply two weeks prior. Plaintiff reported that she takes Ativan as needed which kept her anxiety under better control. Plaintiff reported having severe pain in the right knee and that she occasionally feels as though the knee will give out. Plaintiff reported that ibuprofen and Naproxen[12] caused her to experience side

---

[11]Vicodin is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th ed. 2001).

[12]Naproxen is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the

effects.  Plaintiff reported that Bextra worked well for her but that Medicaid did not cover the medication.  Physical examination showed no warmth or swelling about the knee.  Plaintiff had good range of motion, but marked tenderness was noted over the superior aspect of the patella.  Tenderness was also noted over the medial jointline.  Dr. Womack noted McMurray's test to be mildly positive, but also noted that plaintiff "seemed to have an over-exaggerated response to any movement of the knee."  Plaintiff was diagnosed with right knee pain and Relafen[13] was prescribed.  Physical therapy was recommended.  Plaintiff was also diagnosed with anxiety for which Zoloft was prescribed.  Dr. Womack noted Zoloft to work better for plaintiff than Lexapro.  Dr. Womack instructed plaintiff to take Ativan only when needed until the Zoloft is in her system. Plaintiff was instructed to return in three to four weeks for adjustment of her medications.  (Tr. 303.)

Plaintiff was referred to the Fitness and Rehab Center on May 17, 2004, for evaluation of right knee pain.  (Tr. 288.) Plaintiff rated her pain to be at a level three to five on a scale of one to ten.  Upon examination, it was determined that plaintiff would participate in physical therapy three times per week.  (Tr. 286.)

Plaintiff appeared for physical therapy on May 20, 2004,

---

management of pain.  <u>Physicians' Desk Reference</u> 2744-45 (55th ed. 2001).

[13]Relafen is indicated for acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis. <u>Physicians' Desk Reference</u> 3120-21 (55th ed. 2001).

and reported increased soreness in her knee.  (Tr. 285.)  Plaintiff did not appear at therapy after such date and was discharged on June 22, 2004.  (Tr. 283, 284.)  Plaintiff reported at that time that she was getting along fairly well and did not need to continue.  Plaintiff was instructed to participate in her home exercise program.  (Tr. 283.)

An x-ray taken of plaintiff's right knee on May 20, 2004, showed no bony abnormality.  (Tr. 272, 308.)

On June 10, 2004, plaintiff returned to Dr. Womack who summarized plaintiff's history of anxiety.  Dr. Womack noted plaintiff's previous Lexapro prescriptions not to have been covered by insurance, and that Zoloft caused ringing in the ears.  It was noted that plaintiff had been given samples of Effexor[14] which caused chest tightness and "weird sensations."  Plaintiff reported having significant paranoia since being in the Perryville area and that she had trouble sleeping as a result.  Dr. Womack noted that plaintiff used to be an alcoholic, but plaintiff reported that she no longer drank except for maybe one beer a month when she has a craving.  Dr. Womack determined to try to get Lexapro again through plaintiff's insurance inasmuch as plaintiff seemed to tolerate this medication better than any others.  Zyprexa[15] was also prescribed to take at bedtime to help stabilize the paranoia.  Discussions

---

[14]Effexor is indicated for the treatment of depression. Physicians' Desk Reference 3361 (55th ed. 2001).

[15]Zyprexa is used to treat the symptoms of schizophrenia and to treat bipolar disorder.  Medline Plus (last revised July 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a6012 13.html>.

were had regarding plaintiff going to Community Counseling for further titration and adjustment of medications. In the meantime, Dr. Womack determined to see plaintiff again in two to three weeks for medication review. (Tr. 302.)

Plaintiff returned to the Fitness and Rehab Center on August 6, 2004, and reported progressively worsening bilateral knee pain. It was noted that plaintiff suffered a burn injury to the affected areas one year prior and has had difficulty with knee straightening since that time. (Tr. 277.) Upon physical examination, it was determined that plaintiff would participate in therapy three times weekly for three to five weeks. (Tr. 275, 278.) Plaintiff participated in such physical therapy on August 6 and August 13, 2004. (Tr. 274, 279, 280.)

An MRI taken of plaintiff's right knee on August 13, 2004, showed complete tear of the posterior horn of the medial meniscus. (Tr. 271, 307.)

On August 25, 2004, plaintiff visited Dr. August R. Ritter for evaluation of right knee pain. Dr. Ritter noted physical therapy and medications to have provided inadequate relief. Plaintiff's current medications were noted to be Ativan and Relafen. Upon physical examination and review of the MRI, it was determined that plaintiff would undergo arthroscopic treatment for the right knee. (Tr. 237.)

On September 8, 2004, plaintiff underwent outpatient right knee arthroscopy and arthroscopic partial medial meniscectomy at Perry County Memorial Hospital. (Tr. 235, 239, 270.) During

plaintiff's follow up visit on September 15, 2004, Dr. Ritter noted plaintiff to experience a little stiffness. Dr. Ritter ordered that plaintiff start therapy and Vicodin was prescribed. Plaintiff was instructed to return in three weeks for follow up. (Tr. 235.)

On September 29, 2004, upon review of the evidence of record, including plaintiff's disability reports, medical records relating to plaintiff's burn injuries, and medical records from plaintiff's family physician, Dr. Peter S. Moran, a psychiatrist, completed a Mental Residual Functional Capacity Assessment for Disability Determinations. (Tr. 150-53.) In this checklist assessment, Dr. Moran opined that plaintiff experienced no significant limitations in the domain of Understanding and Memory. In the domain of Sustained Concentration and Persistence, Dr. Moran opined that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; in her ability to work in coordination with or proximity to others without being distracted by them; and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In this domain, Dr. Moran opined that plaintiff had no significant limitations in her abilities to carry out very short and simple instructions as well as detailed instructions; to sustain an ordinary routine without special supervision; and to make simple work-related

- 15 -

decisions.  (Tr. 150-51.)  In the domain of Social Interaction, Dr. Moran opined that plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  In this domain, Dr. Moran opined that plaintiff had no significant limitations in her abilities to interact appropriately with the general public and to ask simple questions or request assistance.  In the domain of Adaptation, Dr. Moran opined that plaintiff had moderate limitations in her ability to respond appropriately to changes in the work setting.  In this domain, Dr. Moran opined that plaintiff had no significant limitations in her abilities to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others.  (Tr. 151.) Dr. Moran opined that plaintiff did not suffer any marked limitations in any domain.  (Tr. 150-51.)

In a Psychiatric Review Technique Form completed September 29, 2004, Dr. Moran opined that plaintiff's mental disorders of depression with anxiety and anxiety with some paranoia resulted in mild restrictions of plaintiff's activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended

duration.  (Tr. 154-67.)

Plaintiff visited Dr. Womack at the Perryville Family Care Clinic on October 29, 2004, for follow up of her anxiety, frequent mood problems and irritability.  Plaintiff was thirty-five years of age.  Plaintiff reported continued feelings of paranoia and of not wanting to leave her house.  Plaintiff reported having some difficulty sleeping.  Plaintiff reported that she was still depressed and tearful.  Plaintiff had not followed up with Community Counseling or with a psychiatrist.  Plaintiff reported continued problems with her right knee and that Relafen was not helping her pain, although she admitted that she was not taking the medication as prescribed.  Upon examination, Dr. Womack diagnosed plaintiff with anxiety and depression.  Plaintiff was instructed to increase her dosage of Lexapro and Zyprexa and to follow up with Community Counseling.  Dr. Womack also refilled plaintiff's prescription for Ativan to take as needed.  Dr. Womack instructed plaintiff to follow up with Dr. Ritter regarding her knee pain and to take medications as prescribed.  (Tr. 231.)

Plaintiff returned to the Family Care Clinic on December 9, 2004, and complained of left flank pain.  No other complaints were noted.  Plaintiff was prescribed Ultracet[16] for pain as well as Levaquin.  Plaintiff was instructed to abstain from taking Relafen while on Ultracet.  (Tr. 230.)

---

[16]Ultracet is an opiate agonist used to relieve moderate to moderately severe pain.  It is used only by people "who are expected to need medication to relieve pain around-the-clock for a long time."  Medline Plus (last revised July 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html>.

On January 31, 2005, plaintiff visited the Family Care Clinic and complained of symptoms associated with an upper respiratory infection. No other complaints were noted. (Tr. 229.)

On February 7, 2005, plaintiff visited the Family Care Clinic and complained of symptoms associated with sinusitis. No other complaints were noted. In addition to antibiotic medication, plaintiff was prescribed Ultracet for severe headache pain. (Tr. 228.)

Plaintiff visited the Community Counseling Center on March 3, 2005, for an intake evaluation. (Tr. 202-07.) Plaintiff reported that she has a severe fear of fire and stays in her house so she cannot get hurt. Plaintiff reported that Dr. Womack told her that she was schizophrenic. Plaintiff reported taking Xanax for years for parimenopausal and menopausal symptoms. (Tr. 202.) Plaintiff reported that she enjoys spending time with her children but is sad for them because they sometimes have to take care of her. (Tr. 202, 204.) Plaintiff reported a period of heavy drinking but stated that she quit abruptly two years prior when her dad died. (Tr. 202-03.) Plaintiff reported her medical history to include migraine headaches, rheumatoid arthritis, burn injuries, and head injury. Plaintiff reported never having seen a psychiatrist but that she underwent years of counseling because of sexual abuse by her father. (Tr. 203.) Plaintiff reported having suffered physical and sexual abuse from family members as a child and that she ran away from home on many occasions. (Tr. 204.) Plaintiff reported taking psychotropic medications as prescribed by

her family physician. Plaintiff denied any suicidal ideation. (Tr. 203.) Upon examination, plaintiff was diagnosed with post-traumatic stress disorder (PTSD)--rule out major depressive disorder, recurrent, severe, without psychotic features; rule out anxiety disorder; and agoraphobia. Plaintiff's Global Assessment of Functioning (GAF) was determined to be 47. It was determined that plaintiff would meet with a staff psychiatrist for psychiatric evaluation and medication monitoring. Length of treatment was anticipated to be for one year. (Tr. 206.)

Plaintiff underwent psychiatric evaluation at the Community Counseling Center on March 21, 2005. (Tr. 218-20.) Plaintiff reported to Dr. Shajitha Nawaz that she has difficulty going out because of anxiety. Plaintiff reported that she feels she will get hurt if she goes out. Plaintiff reported that she has tried many medications but has had no relief. Plaintiff reported that she does not allow her children to be outside for a long time and that she has difficulty going outside and playing with them. Plaintiff reported that she does not interact with other people. Dr. Nawaz noted plaintiff's current medications to include Lexapro, Zoloft, Zyprexa, and Ativan. (Tr. 218.) Plaintiff reported that she had been in psychiatric hospitals as a child primarily for behavioral problems. Plaintiff reported having suffered physical and sexual abuse as a child. (Tr. 219.) Plaintiff reported that she quit school in the eighth grade, had run away from home and had substance abuse problems as a teenager. Plaintiff reported that she then started drinking alcohol but stopped two years ago. (Tr.

218.) Plaintiff reported her only physical problems to be standing and walking because of the burns on her leg. Mental status examination showed plaintiff's mood to be nervous and her affect to be appropriate. Plaintiff reported having some paranoia about people. Plaintiff's attention, concentration and judgment were noted to be "okay." Plaintiff's intellectual ability was noted to be slightly below average and her comprehension skills were noted to be not very good. Plaintiff's insight was fair. (Tr. 219.) Dr. Nawaz diagnosed plaintiff with PTSD--rule out major depressive disorder; agoraphobia; borderline intellectual functioning; and history of burns. Plaintiff's social issues were noted to be severe, and her financial and family issues were noted to be moderate. Plaintiff was instructed to discontinue Ativan and was prescribed Xanax.[17] Plaintiff's dosage of Zoloft was increased. Dr. Nawaz instructed plaintiff to continue with Zyprexa. Plaintiff was encouraged to decrease her smoking and to continue in her abstinence from alcohol. Plaintiff was instructed to return in three weeks for follow up. (Tr. 220.)

Plaintiff returned to Dr. Nawaz on April 11, 2005, and reported feeling better. Plaintiff reported being able to go out more and that she planned to attend her stepfather's funeral that day. Mental status examination showed plaintiff's mood to be "feeling better" and her affect to be appropriate. Plaintiff's insight and judgment were noted to be fair. Plaintiff was

---

[17]Xanax is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. Physicians' Desk Reference 2650 (55th ed. 2001).

diagnosed with PTSD, major depressive disorder and agoraphobia. Plaintiff was instructed to continue with her medications, including Seroquel for sleep. Plaintiff was instructed to increase her dosage of Xanax. Plaintiff was to return in one month for follow up. (Tr. 217.)

Plaintiff visited Dr. Womack on April 28, 2005, and complained of low back pain. Plaintiff reported that she had recently fallen and struck her low back. Plaintiff reported that she went to the emergency room and was given Motrin and Skelaxin,[18] but that such medication did not provide enough relief. Plaintiff requested that Dr. Womack prescribe Vicodin. Dr. Womack noted plaintiff's current medications to include Zoloft, Seroquel[19] and Xanax. Upon physical examination, Dr. Womack recommended that plaintiff take Ultracet as needed for pain and inflammation. Plaintiff was instructed to apply a warm heating pad to the affected area. (Tr. 227.)

On May 9 and May 25, 2005, plaintiff failed to appear for scheduled appointments with Dr. Nawaz at the Community Counseling Center. (Tr. 209-10.)

Plaintiff returned to the Community Counseling Center on June 1, 2005. Plaintiff was upset and reported that her

---

[18]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

[19]Seroquel is indicated for the management of the manifestations of psychotic disorders. Physicians' Desk Reference 639-40 (55th ed. 2001).

boyfriend's family felt that she neglected his mother and she died. Plaintiff admitted that she took more Xanax than she was supposed to but argued that Dr. Nawaz said that she could take more. Plaintiff was diagnosed with PTSD and major depressive disorder and was instructed to continue with Xanax, Zoloft and Seroquel. Plaintiff was instructed to return in two months. (Tr. 216.)

On July 25, 2005, plaintiff visited the Perryville Family Care Clinic and complained of a broken tooth. It was noted that plaintiff had a dentist appointment in two weeks, but that the dentist did not accept Medicaid. Plaintiff was given antibiotics and was instructed to apply a cold compress and to take Ultracet as needed. (Tr. 226.)

Plaintiff returned to Dr. Nawaz at the Community Counseling Center on August 3, 2005, and reported anxiety due to financial problems. Plaintiff also reported feeling anxious when she sees a fire burning. Plaintiff's mood was noted to be stressed and her affect appropriate. Dr. Nawaz continued in her diagnoses of PTSD and major depressive disorder and instructed plaintiff to continue with her medications. Plaintiff's dosage of Zoloft was increased. Plaintiff was advised that her Xanax prescription would not be refilled before the due date. (Tr. 215.)

Plaintiff returned to the Community Counseling Center on September 11, 2005, and reported that she stopped taking Zoloft because she snapped at her kids. Plaintiff requested a different mood stabilizer. Plaintiff reported that she had been "okay" since being off of the anti-depressant. Plaintiff reported her sleep to

be better but not great.  Plaintiff was prescribed Lamictal[20] for a trial period and was instructed to continue with her other medications of Xanax and Seroquel.  Zoloft was discontinued.  (Tr. 214.)

On October 12, 2005, plaintiff reported to Dr. Nawaz that Lamictol made her think more and made her suicidal.  Plaintiff's mood was noted to be irritable.  Insight and judgment were noted to be poor.  Plaintiff was diagnosed with major depressive disorder --rule out malingering.  PTSD was no longer a diagnosis for plaintiff and indeed had been crossed out in the treatment note. Dr. Nawaz questioned whether plaintiff exhibited traits of bipolar disorder.  Dr. Nawaz noted plaintiff to have previously taken Paxil,[21] Lexapro, Zoloft, Zyprexa, and Prozac.[22]  Plaintiff was instructed to discontinue Lamictol and to continue with Seroquel and Xanax.  (Tr. 213.)

Plaintiff returned to the Community Counseling Center on November 2, 2005, and reported that her panic attacks were under control and that her sleep was under control with Seroquel.  It was noted that plaintiff was calmer and, overall, was dealing with her

---

[20]Lamictal is an anticonvulsant used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder.  Medline Plus (last revised June 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695007.html>.

[21]Paxil is indicated for the treatment of depression. Physicians' Desk Reference 3114-15 (55th ed. 2001).

[22]Prozac is indicated for the treatment of, inter alia, depression and panic attacks.  Medline Plus (last revised Feb. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html>.

poor finances. Plaintiff's mood was noted to be pleasant but worried. Plaintiff was diagnosed with major depressive disorder--rule out malingering, and bipolar disorder traits. Plaintiff was instructed to continue with Xanax and Seroquel and was instructed to return in one month. (Tr. 212.)

On November 11, 2005, plaintiff returned to the Family Care Clinic with complaints of a cracked tooth as well as complaints associated with urinary tract infection. Plaintiff was given antibiotics and was instructed to take Ultracet as needed for pain. (Tr. 225.)

On November 30, 2005, plaintiff complained to the Community Counseling Center that she needed something for depression. It was noted that plaintiff had tried most anti-depressants but reported that she could not take them. Plaintiff reported that Seroquel helps her to fall asleep but that she has difficulty staying asleep. Plaintiff's mood and affect were noted to be negative and sarcastic. Plaintiff was diagnosed with major depressive disorder--rule out malingering, and bipolar disorder traits. Plaintiff was instructed to continue with Seroquel and Xanax, and Trazodone[23] was prescribed. (Tr. 211.)

Plaintiff returned to the Community Counseling Center on January 4, 2006, and reported that she occasionally sees things. Plaintiff asked that she be permitted to stop taking Seroquel and to take Ambien. Plaintiff reported that Trazodone was helping with

[23]Trazodone is used to treat depression. Medline Plus (last revised Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a681038.html>.

sleep.  Plaintiff reported her mood to have been good.  Plaintiff was diagnosed with major depressive disorder--rule out malingering, and bipolar disorder traits.  Plaintiff was instructed to discontinue Seroquel and to continue with Xanax and Trazodone. Abilify[24] was added to plaintiff's medication regimen.  (Tr. 200.)

Plaintiff visited Dr. Nawaz at the Community Counseling Center on February 1, 2006, and reported that she was bothered by her neighbor burning trash.  Plaintiff reported no new symptoms. Plaintiff reported that she was managing financially with child support.  Plaintiff reported that she does not drive much during the day.  Dr. Nawaz continued in her diagnoses of major depressive disorder--rule out malingering, and bipolar disorder traits. Plaintiff was instructed to continue with her current medications. (Tr. 198.)

On March 14, 2006, plaintiff returned to the Community Counseling Center and reported that she was not doing well. Plaintiff reported having situational stressors and complained of sleep problems.  Plaintiff reported that Trazodone was not working. Plaintiff reported taking more Xanax than prescribed at times.  It was noted that plaintiff had some vague paranoia.  Plaintiff was observed to be dramatic and questioned whether the physician thought she was faking.  Plaintiff denied any hallucinations or any

---

[24]Abilify is an antipsychotic medication used to treat symptoms of schizophrenia and to treat episodes of mania or mixed episodes in persons with bipolar disorder.  Abilify is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone.  Medline Plus (revised June 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a603012.html>.

suicidal ideations.  It was determined for plaintiff to stop taking Trazodone.  It was also determined that plaintiff's Xanax would be decreased in frequency and that consideration would be made for plaintiff to taper off Xanax completely.  Plaintiff's dosage of Abilify was increased and Remeron[25] was prescribed for sleep, impulsivity and depression.  Plaintiff was instructed not to engage in potentially dangerous activities such as driving or working with heavy machinery if she experienced dizziness or drowsiness with her medications.  Counseling was recommended to develop coping skills. (Tr. 197.)

On April 25, 2006, plaintiff failed to appear for a scheduled appointment at the Community Counseling Center.  (Tr. 196.)

On May 2, 2006, plaintiff visited the Community Counseling Center and requested a refill of her medications, and plaintiff was provided with a month's supply of Abilify, Remeron and Xanax.  Plaintiff was informed that no more medication refills would be called in.  It was also noted that plaintiff had moved to St. Louis and that she had an appointment with a psychiatrist at Hopewell on May 24.  (Tr. 196.)

Plaintiff was discharged from the Community Counseling Center on May 15, 2006, for the reason that she moved out of the area.  It was noted that plaintiff made slow progress due to financial trouble and an abrupt move to St. Louis.  Plaintiff's GAF

---

[25]Remeron is indicated for the treatment of depression. Physicians' Desk Reference 2290 (55th ed. 2001).

was determined to be 55 upon discharge. Plaintiff's prognosis was noted to be questionable. (Tr. 195.)

On June 16, 2006, plaintiff underwent psychosocial evaluation at Chesterfield Valley Psychiatry. Plaintiff was presently thirty-seven years of age. Plaintiff reported that she had been on medication for years and had a long history of bipolar disorder and PTSD. Plaintiff reported that she does not sleep well and gets about three to four hours of sleep at night. Plaintiff reported irritability, worry, and excessive fearfulness. Dr. Syed Shahid Mumtaz noted plaintiff's mood to be euthymic and her affect restricted. Plaintiff was diagnosed with major depression and PTSD. Bipolar disorder was to be ruled out. Plaintiff's current GAF was determined to be 60. Plaintiff was prescribed Abilify and was instructed to continue with Xanax and an increased dosage of Trazodone. (Tr. 327.)

Plaintiff returned to Dr. Mumtaz on July 1, 2006, for medication management. Plaintiff reported that she was sleeping better but experienced flashbacks at night and felt as though someone was choking her. Dr. Mumtaz instructed plaintiff to increase her dosage of Trazodone and Abilify and to continue with Xanax as prescribed. Side effects of plaintiff's medications were discussed and were noted to be absent. (Tr. 326.)

On July 29, 2006, plaintiff visited Dr. Mumtaz and expressed no concerns about anxiety. Plaintiff reported that she still experienced flashbacks at night but expressed no concerns about sleep. Dr. Mumtaz noted plaintiff's mood to be depressed and

angry and her affect to be restricted. Plaintiff was instructed to continue with her medications as prescribed. (Tr. 325.)

On September 15, 2006, plaintiff expressed no new concerns to Dr. Mumtaz other than grogginess from Trazodone. No new stressors were noted. Plaintiff denied any mood swings, irritability or somatic complaints. Plaintiff's mood was noted to be euthymic and her affect restricted. Plaintiff was instructed to continue with her medications with a decrease in her dosage of Trazodone. (Tr. 324.)

### IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through June 30, 2008. The ALJ also found that plaintiff had engaged in substantial gainful activity in 2004, which was after the alleged onset date of disability, that is, September 1, 2003. The ALJ found plaintiff's major depressive disorder, borderline personality disorder traits, 2004 knee surgery, and 2003 burn injuries to be severe impairments, but that such impairments did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff to have the residual functional capacity (RFC) to sit for most of a work day, to stand and walk intermittently for up to six hours in a work day, to lift and carry up to ten pounds frequently and twenty pounds occasionally, and to perform simple tasks. The ALJ determined plaintiff's burn injuries to limit her to light work activities, and plaintiff's mental disorders to limit her to simple work. The ALJ determined that plaintiff's RFC

prevented her from performing her past relevant work. Upon
considering plaintiff's age, education, work experience, and RFC,
the ALJ determined that the Medical-Vocational Guidelines provided
for a finding of "not disabled." Accordingly, the ALJ determined
that plaintiff was not under a disability at any time through the
date of the decision. (Tr. 12-19.)

## V. Discussion

To be eligible for Social Security Disability Insurance
Benefits and Supplemental Security Income under the Social Security
Act, plaintiff must prove that she is disabled. <u>Pearsall v.</u>
<u>Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary</u>
<u>of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The
Social Security Act defines disability as the "inability to engage
in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months." 42 U.S.C. §§
423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared
disabled "only if [her] physical or mental impairment or
impairments are of such severity that [she] is not only unable to
do [her] previous work but cannot, considering [her] age,
education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy." 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the
Commissioner engages in a five-step evaluation process. <u>See</u> 20

C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is

supported by substantial evidence, the Court must review the entire

administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically,

plaintiff contends that the ALJ'S determination as to plaintiff's RFC was not based upon medical evidence and that the ALJ should have developed additional evidence from plaintiff's treating physicians relating thereto. Plaintiff also contends that the ALJ erred in finding plaintiff not to be credible. Finally, plaintiff argues that the ALJ erred by relying on the Medical-Vocational Guidelines to find plaintiff not to be disabled. Plaintiff contends that, given her non-exertional mental impairments, the ALJ was required to obtain testimony from a vocational expert regarding plaintiff's ability to perform work.

A.    Credibility Determination

        Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, she may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id.

        When, on judicial review, a plaintiff contends that the

ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in her decision that she considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez, 403 F.3d at 957; Pearsall, 274 F.3d at 1218.

In this cause, the ALJ set out numerous inconsistencies in the record to support her conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted that no treating physician or therapist ever placed any specific long term work-related restrictions upon plaintiff's activities nor advised plaintiff against working. See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (adverse credibility determination supported by finding that no physician had imposed any work-related restrictions); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996)

(lack of any significant restrictions imposed by treating physicians supported credibility decision). The ALJ also noted that plaintiff's credibility was diminished by her failure to comply with recommended treatment, including missing many treatment sessions. See Tellez, 403 F.3d at 957 (missing medication checks and psychiatric appointments and not taking medications as prescribed supported adverse credibility determination). The ALJ also found plaintiff's drug-seeking and drug-abuse-type behaviors to detract from her credibility. While plaintiff challenges this finding, stating that no diagnosis of drug abuse appears in the record, a review of the record as a whole shows plaintiff to have indeed engaged in drug-seeking behavior by providing numerous and inconsistent reasons why various medications, including potent pain medications and psychotropic medications, needed to be refilled prior to schedule. Indeed, as noted in their records, plaintiff's physicians questioned and counseled plaintiff on this behavior, and on occasion refused to refill prescriptions as requested. Drug-seeking behavior reflects adversely on a claimant's credibility. See Anderson v. Shalala, 51 F.3d 777, 780 (8th Cir. 1995). The ALJ also noted that plaintiff's treating psychiatrist, Dr. Nawaz, continually noted the need to rule out malingering and that other physicians found plaintiff to have exaggerated symptoms in the past and to have been dramatic. See Rappoport v. Sullivan, 942 F.2d 1320, 1322-23 (8th Cir. 1991) (physician's statement questioning possibility of malingering and spouse's statement as to claimant maximizing his symptoms considered by ALJ in determining

credibility).  Finally, the ALJ noted that plaintiff's earnings record failed to enhance her credibility inasmuch as, despite her record which showed her earnings to usually have been very low, plaintiff's best earnings came in 2004 when she was allegedly disabled.  Contrary to plaintiff's assertion, such factors may be considered in determining a claimant's credibility.  See Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility).

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before her and set out numerous inconsistencies detracting from plaintiff's credibility.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination.  Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).

B.   Residual Functional Capacity

Residual functional capacity is what a claimant can do despite her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  The ALJ bears the primary responsibility for

assessing a claimant's RFC based on all relevant, credible evidence
in the record, including medical records, the observations of
treating physicians and others, and the claimant's own description
of her symptoms and limitations. <u>Goff v. Barnhart</u>, 421 F.3d 785,
793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A
claimant's RFC is a medical question, however, and some medical
evidence must support the ALJ's RFC determination. <u>Hutsell v.
Massanari</u>, 259 F.3d 707, 711-12 (8th Cir. 2001); <u>Lauer v. Apfel</u>,
245 F.3d 700, 703-04 (8th Cir. 2001). The ALJ is "required to
consider at least some supporting evidence from a [medical
professional]" and should therefore obtain medical evidence that
addresses the claimant's ability to function in the workplace.
<u>Hutsell</u>, 259 F.3d at 712 (internal quotation marks and citation
omitted). An ALJ's RFC assessment which is not properly informed
and supported by some medical evidence in the record cannot stand.
<u>Id.</u> An RFC checklist completed by a non-treating, non-examining
physician who has merely reviewed reports is not *medical* evidence
as to how the claimant's impairments affect her current ability to
function and thus cannot alone constitute substantial evidence to
support an ALJ's RFC assessment. <u>See Nevland v. Apfel</u>, 204 F.3d
853, 858 (8th Cir. 2000); <u>Nunn v. Heckler</u>, 732 F.2d 645, 649 (8th
Cir. 1984).

Plaintiff does not argue with the ALJ's RFC determination
as it relates to plaintiff's physical ability to perform work.
Instead, plaintiff contends that the ALJ's finding that plaintiff
has the mental RFC to perform simple work is not supported by

medical evidence and that the ALJ should have obtained additional evidence from plaintiff's treating psychiatrist and therapist relating to her mental capacity to perform work.  For the following reasons, the plaintiff's argument is well taken.

In her written decision, the ALJ accorded great weight to the records of plaintiff's treating psychiatrists and therapists and noted that none of these treating professionals imposed any work restrictions on plaintiff nor advised plaintiff against working.  (Tr. 17.)  The ALJ also acknowledged the assessment completed by Dr. Moran and his opinion that plaintiff suffered some moderate work-related limitations, but noted that Dr. Moran never examined plaintiff nor had the benefit of all of plaintiff's medical records for review, and that none of the limitations as expressed by Dr. Moran were ever identified by plaintiff's treating physicians.  (Tr. 17.)  Although plaintiff contends otherwise, the ALJ did not err in according little weight to the checklist assessment from this non-examining, reviewing physician.  <u>Taylor v. Chater</u>, 118 F.3d 1274, 1279 (8th Cir. 1997).

A review of the ALJ's decision, however, shows her to have nevertheless relied on that portion of Dr. Moran's assessment which found plaintiff able to perform simple tasks.  (Tr. 17-18.) Standing alone, this checklist assessment from a non-examining physician does not constitute *medical* evidence to support the ALJ's RFC determination that plaintiff can perform simple tasks.  <u>See Nevland</u>, 204 F.3d at 858.  This is especially true here, where Dr. Moran's September 2004 assessment was completed prior to plaintiff

receiving any treatment from a mental health professional, and indeed nearly two years prior to the administrative hearing in this cause. See Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (ALJ must determine claimant's RFC as it exists at time of administrative hearing). Other than Dr. Moran's checklist assessment, the medical record is silent as to plaintiff's mental ability to perform in the workplace. The ALJ appears to rely on this silence to support her RFC finding, specifically and repeatedly noting the lack of any opinion from plaintiff's treating psychiatrists and therapists as to plaintiff's functional limitations. (Tr. 17.) However, "[a] treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment." Hutsell, 259 F.3d at 712. A review of the record shows that none of plaintiff's treating psychiatrists or therapists were asked their opinion as to plaintiff's functional limitations. To the extent any treating mental health professional determined to discharge plaintiff from their care, such determination was made on account of plaintiff's move from the area and not from successful completion of therapy. Indeed, plaintiff immediately sought and obtained treatment from another mental health facility upon her move and continued to obtain such treatment at the time of the hearing. For the ALJ to make an RFC determination based on silence in the medical record was error.

<u>Id.</u>

In the absence of medical evidence demonstrating the extent to which plaintiff may be limited in her ability to perform work activities, the ALJ had a duty to fully and fairly develop the record by seeking an opinion from plaintiff's treating mental health professionals as to how plaintiff's impairments affect her ability to perform specific functions in the workplace. <u>See</u> <u>Nevland</u>, 204 F.3d at 858; <u>see also</u> <u>Lauer</u>, 245 F.3d at 705-06. Despite the numerous treatment notes from Dr. Nawaz, Dr. Mumtaz and the Community Counseling Center, no inquiries were made of these treating professionals as to plaintiff's mental ability to function in the workplace. Accordingly, it cannot be said that the ALJ's determination that plaintiff retained the mental RFC to perform simple tasks is supported by substantial evidence on the record as a whole. This cause should therefore be remanded to the Commissioner for a proper assessment of plaintiff's functional limitations resulting from her mental impairments, including obtaining information from plaintiff's treating mental health professionals as to what level of work, if any, plaintiff is mentally able to perform. <u>Dixon v. Barnhart</u>, 324 F.3d 997, 1003 (8th Cir. 2003); <u>Nevland</u>, 204 F.3d at 858.

## C.    <u>Vocational Expert</u>

Finally, plaintiff contends that the ALJ erred by using the Medical-Vocational Guidelines (Guidelines) and accompanying Rules to guide her decision to find plaintiff not disabled. Plaintiff argues that the existence of her non-exertional mental

impairments required the ALJ to obtain evidence from a vocational expert as to what work, if any, plaintiff can perform in the national economy.

Where an ALJ determines that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to show that there are other jobs that the claimant is capable of performing. <u>Reed v. Sullivan</u>, 988 F.2d 812, 815 (8th Cir. 1993). If the claimant suffers from only exertional impairments, this burden may be met by reference to the Guidelines. <u>Bolton v. Bowen</u>, 814 F.2d 536, 537 n.3 (8th Cir. 1987). Use of the Guidelines is also permissible where a non-exertional impairment is found to exist "provided that the ALJ finds, and the record supports the finding, that the non-exertional impairment does not significantly diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." <u>Harris v. Shalala</u>, 45 F.3d 1190, 1194 (8th Cir. 1995) (citing <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988)). <u>See also</u> <u>Bolton</u>, 814 F.2d at 537-38. The burden is on the ALJ to demonstrate that the use of the Guidelines is proper. <u>Lewis v. Heckler</u>, 808 F.2d 1293, 1298 (8th Cir. 1987). Where a non-exertional impairment significantly diminishes the claimant's RFC, the Guidelines are not controlling and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. <u>Harris</u>, 45 F.3d at 1194; <u>Sanders v. Sullivan</u>, 983 F.2d 822, 823 (8th Cir. 1992); <u>Thompson v. Bowen</u>, 850 F.2d 346, 350 (8th Cir.

1988).

In this cause, the ALJ noted that plaintiff's exertional ability to perform the full range of light work, when coupled with her age and education, would require a finding of "not disabled" under Guidelines Rules 202.17 and 202.18. Recognizing that plaintiff's mental impairments limited her to the performance of simple tasks, however, the ALJ examined whether such non-exertional limitation compromised plaintiff's ability to perform the jobs administratively noted in these Rules. The ALJ found that it did not. Specifically, the ALJ noted that Rules 202.17 and 202.18 took administrative notice of unskilled occupations, and that 20 C.F.R. §§ 404.1568(a) and 416.968(a) recognized "unskilled occupations" to be "the least sophisticated occupations in the economy. They entail simple duties involving little or no judgment." Because performing unskilled work involved the performance of only simple tasks, the ALJ reasoned that plaintiff's non-exertional limitation to simple tasks did not remove consideration of plaintiff's claim from the framework of the Guidelines. (Tr. 18-19.)

An ALJ's finding that a claimant has a mental impairment which limits her to the performance of simple work "parrots the attributes of *work*, not the limitations experienced by [the claimant.]" Allen v. Barnhart, 417 F.3d 396, 404 (3d Cir. 2005) (emphasis added). To find that there exists an occupational base for one with the claimant's mental limitations, there must be a "fit" between the specific nature of the claimant's mental limitations and the way in which such non-exertional limitations

impact the occupational base.  Id. at 405-06.

> Because response to the demands of work is
> highly individualized, the skill level of a
> position is not necessarily related to the
> difficulty an individual will have in meeting
> the demands of the job.  A claimant's
> condition may make performance of an unskilled
> job as difficult as an objectively more
> demanding job.

Id. at 406.

Here, the ALJ failed to articulate what specific factors
and/or conditions resulted in plaintiff being limited to the
performance of only simple tasks.  Without identifying plaintiff's
specific mental limitations and fitting such limitations within the
framework of the Guidelines, it cannot be said that reliance on the
Guidelines alone without eliciting testimony from a vocational
expert was permissible.

Accordingly, upon remand, the ALJ must properly
determine, upon some medical evidence, the extent to which
plaintiff's mental impairments cause her to be functionally limited
in her ability to perform work.  See discussion supra, at Section
V.B.  The ALJ must then proceed to consider the specific
limitations caused by plaintiff's non-exertional impairment and
determine whether such limitations nevertheless do not preclude
plaintiff's performance of the full range of activities listed in
the Guidelines.  Harris, 45 F.3d at 1194.[26]  For the reasons set out

_____

[26]This procession to step five of the analysis assumes that the
Commissioner upon remand will continue to find plaintiff unable to
perform her past relevant work.

in _Allen_, a simple categorical finding that plaintiff can perform simple tasks is insufficient.  417 F.3d at 404-06.  Finally, if it is determined that plaintiff's non-exertional impairment significantly diminishes her RFC to perform work, the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with plaintiff's abilities.  _Harris_, 45 F.3d at 1194; _Sanders_, 983 F.2d at 823; _Thompson_, 850 F.2d at 350.  Reliance on the Guidelines in such circumstances would be improper.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this matter be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **July 14, 2008.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  _Thompson v. Nix_, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
———————————————————
UNITED STATES MAGISTRATE JUDGE


Dated this _2nd_ day of July, 2008.

- 43 -